# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

In Re:  Christopher David McGinnis,                    Case No. 17-32815-KLP
                   Debtor.                              Chapter 7 Proceeding

| | |
|---|---|
| CHESAPEAKE BANK, | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CHRISTOPHER DAVID MCGINNIS, | ) |
| and | ) |
| HARRY SHAIA, JR., Trustee, | ) |
| | ) |
|        Defendants. | ) |

## <u>NOTICE OF AND CONSENT MOTION FOR RELIEF FROM<br>THE AUTOMATIC STAY OF 11 U.S.C. § 362</u>

Chesapeake Bank has filed papers with the Court to seek relief from the automatic stay.

**<u>Your rights may be affected.</u>  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one.)**

If you do not want the Court to grant the relief sought in this motion, or if you want the Court to consider your views on the motion, then you must file a written response explaining your position with the Court at the following address:

File with the Court an answer, explaining your position at:

William C. Redden, Clerk
U.S. Bankruptcy Court
Eastern District of Virginia, Richmond Division
701 East Broad Street, Suite 4000
Richmond, VA 23219

_____
Robert H. Chappell, III, Esquire (VSB #31698)
Jennifer J. West, Esquire (VSB #47522)
James K. Donaldson, Esquire (VSB #80307)
Spotts Fain PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Phone:  (804) 697-2000
Fax:  (804) 697-2100
*Counsel for Chesapeake Bank*

You must also mail a copy to

Robert H. Chappell, III, Esquire
Spotts Fain PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219

and to

Harry Shaia, Jr., Chapter 7 Trustee
c/o William A. Broscious, Esquire
Kepley Broscious & Biggs, PLC
2211 Pump Road
Richmond, Virginia 23233

If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the Motion and may enter an Order granting that relief.

## CONSENT MOTION FOR RELIEF FROM STAY

Chesapeake Bank ("Chesapeake") submits the following Consent Motion for Relief from the Automatic Stay of 11 U.S.C. § 362, requesting the Court permit Chesapeake to enforce its remedies under its security instruments and state law, including the right to foreclose upon and sell certain property owned by the Debtor, as defined herein, or enter an order granting it adequate protection of its security interest.  In support of this Motion, Chesapeake states the following:

1.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1334.  This matter is a "core" proceeding as set forth under 28 U.S.C. § 157.

2.      On May 31, 2017 (the "Petition Date"), Christopher David McGinnis (the "Debtor") filed a petition under Chapter 7 of Title 11 of the United States Code.

3.      On June 1, 2017, the Court appointed Lynn L. Tavenner as Interim Trustee and on July 11, 2017, Ms. Tavenner filed a Resignation of Trustee.

4.      On July 12, 2017, the Court appointed Bruce E. Robinson as Trustee and on

August 25, 2017, Mr. Robinson filed a Resignation of Trustee.

5.      On August 29, 2017, the Court appointed Harry Shaia, Jr. as Trustee and Mr. Shaia continues to serve as the Trustee for the Bankruptcy Estate of the Debtor.

## LOAN DOCUMENTS

6.      On or about April 22, 2013, the Debtor executed an Adjustable Rate Note (the "Note") in the original principal amount of $206,000.00.  Chesapeake is the holder of the Note. A copy of the Note is attached hereto as **Exhibit 1**.

7.      The Note is secured by a Deed of Trust dated April 22, 2013, and recorded in the Clerk's Office, Circuit Court of the County of Mathews, Virginia at Instrument No. 130000599 on April 22, 2013 (the "Deed of Trust").  The Deed of Trust was executed by the Debtor and encumbers real estate owned by him in the County of Mathews, Virginia described as and known hereafter as 1950 Lily's Neck Road, Moon, Virginia 23119 (the "Property") and more particularly described below.  A copy of the Deed of Trust is attached hereto as **Exhibit 2**.

8.      On or about July 28, 2016, the Debtor executed a Change in Terms Agreement which modified the Note and the Deed of Trust (the "Change in Terms").  A copy of the Change in Terms is attached hereto as **Exhibit 3**.

9.      The legal description of the Property is:

ALL THAT CERTAIN LOT, PIECE OR PARCEL OF LAND LYING AND BEING IN WESTVILLE DISTRICT, MATHEWS COUNTY, VIRGINIA, CONTAINING 4.80 ACRES, MORE OR LESS, SHOWN AND DESCRIBED AS "REVISED PARCEL B 4.80 AC±" ON THAT CERTAIN PLAT DATED JANUARY 20, 2003, ENTITLED "PLAT OF PROPERTY LINE ADJUSTMENT ON THE PROPER TY OF JUDITH TAMMANY GAON PERSONAL TRUST CREATING REVISED PARCEL B - 4.80 AC ± & REVISED PARCEL C - 67.80 AC ±" AND RECORDED IN THE CLERK'S OFFICE OF THE CIRCUIT COURT OF MATHEWS COUNTY, VIRGINIA IN CLERK'S PLAT BOOK 24 AT PAGE 156.

TOGETHER WITH AND SUBJECT TO A PERPETUAL NON-EXCLUSIVE EASEMENT OF RIGHT OF WAY THIRTY FEET (30') IN WIDTH AS A MEANS OF INGRESS AND EGRESS TO AND FROM STATE ROUTE 644, MORE PARTICULARLY DESCRIBED IN A CERTAIN DEED OF RUTH WEBER DOWNS, ET AL., DATED JULY 15, 1989 AND RECORDED IN THE AFORESAID CLERK'S OFFICE IN DEED BOOK 151 PAGE 345.

TOGETHER WITH AND SUBJECT TO A FORTY FOOT (40') PERPETUAL NON- EXCLUSIVE EASEMENT OF RIGHT OF WAY SHOWN AS "LILLY'S NECK LANE" ON THE AFORESAID PLAT, WHICH RIGHT OF WAY SERVES PARCEL A AND REVISED PARCELS B AND C AS SHOWN ON THE AFORESAID PLAT AS A MEANS OF INGRESS
AND EGRESS TO AND FROM THE 30' RIGHT OF WAY LEADING TO STATE ROUTE 644.

TOGETHER WITH AND SUBJECT TO PERPETUAL NON-EXCLUSIVE TWENTY FOOT (20') SEWER EASEMENT, DESIGNATED ON THE AFORESAID PLAT AND A PERPETUAL DRAIN FIELD EASEMENT, DESIGNATED ON THE AFORESAID PLAT AS "DRAINFIELD EASE. PARCEL B", FOR THE PURPOSE OF INSTALLING, CONSTRUCTING, MAINTAINING, INSPECTING, OPERATING, REPAIRING, ALTERING, REPLACING AND REMOVING A SEWAGE DISPOSAL SYSTEM AND THE NECESSARY SEWER LINES, AND OTHER APPURTENANT FACILITIES FOR THE COLLECTION AND TRANSMISSION OF SEWAGE AND OTHER WASTES, THROUGH SAID LINES, AS WELL AS A TEMPORARY CONSTRUCTION EASEMENT FOR THE AFORESAID PURPOSES ACROSS THE PROPERTY OF GRANTORS.

SUBJECT TO A TWENTY FOOT (20') SEWER EASEMENT FOR "PARCEL A" AS SHOWN ON THE AFORESAID PLAT.

BEING THE SAME REAL ESTATE CONVEYED TO CHRISTOPHER DAVID MCGINNIS BY DEED FROM DANIEL J. CLEARY, III AND SUSANNE C. CLEARY, HUSBAND AND WIFE, DATED APR IL 10, 201 3 AND RECORDED IMMEDIATELY PRIOR TO THIS INSTRUMENT IN THE CLERK'S OFFICE OF THE CIRCUIT COURT OF MATHEWS COUNTY, VIRGINIA.

10.    There is no equity in the Property and the Property is not necessary to an effective

reorganization.

## **GROUNDS FOR RELIEF**

11.    Chesapeake is a secured creditor of the Debtor with a payoff of $218,230.64 as of

November 14, 2017.

12.     On or about May 31, 2017, the Debtor filed with the Court a Statement of Intention whereby he stated that he intends to retain the Property; however, as of November 14, 2017, the loan secured by Chesapeake's lien on the Property was 928 days past due.

13.     Additionally, real estate taxes have not been paid on the Property since 2014.  As of November 14, 2017, the past due taxes total $5,812.23 and as of December 5, 2017, an additional $796.09 in real estate taxes will be due.

14.     Upon information and belief and based on representations made by counsel for the Debtor and as evidenced by the signatures of Debtor's counsel and the Trustee on the proposed Consent Order attached hereto as **Exhibit 4**, the Debtor and the Trustee consent to the relief requested herein.

15.     The interests of Chesapeake in the Property are not adequately protected and cause exists for granting relief from the automatic stay of 11 U.S.C. § 362(d).

WHEREFORE, Chesapeake Bank respectfully requests that this Court enter an Order granting Chesapeake Bank relief from the automatic stay of 11 U.S.C. § 362 as to the Property, allowing Chesapeake Bank to enforce its remedies under the Note, the Change in Terms, the Deed of Trust and under state law, including the right to foreclose upon the Property or otherwise granting it adequate protection of its security interest, and that it have such other and further relief as the Court may deem appropriate.

CHESAPEAKE BANK

By:  /s/ Robert H. Chappell, III
Counsel

Robert H. Chappell, III, Esquire (VSB #31698)
Jennifer J. West, Esquire (VSB #47522)
James K. Donaldson, Esquire (VSB #80307)
Spotts Fain PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Phone:  (804) 697-2000
Fax:  (804) 697-2100
*Counsel for Chesapeake Bank*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Notice of and Consent Motion for Relief from Automatic Stay was sent via U.S. Mail, postage prepaid, and/or delivered by electronic means, this 18th day of December, 2017 to the following, constituting all necessary parties:

Christopher David McGinnis
P.O. Box 191
Petersburg, VA 23804
*Debtor*

Hunter R. Wells
Canfield, Wells & Kruck, LLP
4124 E. Parham Road
Henrico, VA 23228
*Debtor's Counsel*

Harry Shaia, Jr
Spinella, Owings & Shaia, P.C.
8550 Mayland Drive
*Chapter 7 Trustee*

William A. Broscious
Kepley Broscious & Biggs, PLC
2211 Pump Road
Richmond, VA 23233
*Chapter 7 Trustee's Counsel*

Judy A. Robbins
Office of the U.S. Trustee - Region 4-R
701 E. Broad Street, Suite 4304
Richmond, VA 23219
*Office of the U.S. Trustee*

Shannon Pecoraro
Office of the U.S. Trustee
701 East Broad Street, Suite 4304
Richmond, VA 23219
*Office of the U.S. Trustee*

/s/ Robert H. Chappell, III

## SPECIAL NOTICE

**THE FOLLOWING NOTICE IS GIVEN TO YOU IN THE EVENT THAT THE FAIR DEBT COLLECTION PRACTICES ACT (15 U.S.C. 1692 *et seq*) APPLIES TO THIS COMMUNICATION.**
**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.   THIS COMMUNICATION IS FROM A DEBT COLLECTOR.**

# Exhibit 1

Loan No.: ████9290

# ADJUSTABLE RATE NOTE
(Wall Street Journal Prime Rate Index- Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM AND MINIMUM RATE I MUST PAY.**

| | | |
|---|---|---|
| **April 22, 2013** | **Mathews** | **VIRGINIA** |
| [Date] | [City] | [State] |

**1950 Lily's Neck Road, Moon, VIRGINIA 23119**
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $206,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Chesapeake Bank. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. Initially, I will pay interest at a yearly rate of 5.000%. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **FIRST** day of each month beginning on **June 1, 2013**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on May 1, 2033, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P. O. Box 2256, Kilmarnock, VIRGINIA 22482 or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,359.51. This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the **FIRST** day of **May, 2016**, and on that day every 36th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Changes in the interest rate are governed by changes in an interest rate index called the "Index." The "Index" is the lowest Prime Rate charged by banks as published in the Wall Street Journal "Money Rates" table. The most recent Index figure available as of the date 35 days before each Change Date is called the "Current Index"

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Zero and 49/100** percentage points **(0.490%)** to the Current Index. The note holder will then round the result of the addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.000%** or less than **5.000%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than Three percentage points (3.000%) from the rate of interest I have been paying for the preceding 36 months. My interest rate will never be greater than **11.000%**, nor less than **5.000%**.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of ten (10) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be five percent (5.00%) of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

---

Virginia Adjustable Rate Note

**(C) Notice of Default**

If I am in default, the Note Holder shall send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment, Demand, Protest, and Notice of Dishonor. Further, I and any person who has obligations under this Note waive the benefit of our homestead exemption as to this Note and the indebtedness evidenced hereby. And further, I and any person who has obligations under this Note, agree to remain bound for the payment of this Note, notwithstanding any extension or extensions of time of payment of it or any part of it made by agreement with any one or more of the parties hereto either before, at or after maturity.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Christopher David MCGINNIS          -Borrower

*[Sign Original Only]*

# ADJUSTABLE RATE RIDER
### (Wall Street Journal Prime Rate Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **22nd** day of **April, 2013**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Chesapeake Bank** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**1950 Lily's Neck Road, Moon, VIRGINIA 23119**
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM AND MINIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 5.000%. The Note provides for changes in the interest rate and the monthly payments as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the **first** day of **May, 2016**, and on that day every 36th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**
Changes in the interest rate are governed by changes in an interest rate index called the "Index." The "Index" is the lowest Prime Rate charged by banks as published in the Wall Street Journal "Money Rates" table. The most recent Index figure available as of the date 35 days before each Change Date is called the "Current Index"
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **Zero and 49/100** percentage points (**0.490%**) to the Current Index. The note holder will then round the result of the

---

addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D)  Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **8.000%** or less than **5.000%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **Three** percentage points (**3.000%**) from the rate of interest I have been paying for the preceding 36 months. My interest rate will never be greater than **11.000%**, nor less than **5.000%**.

### (E)  Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F)  Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that

---

Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Multistate Adjustable Rate Rider

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
Christopher David MCGINNIS          -Borrower

Multistate Adjustable Rate Rider

Page 4 of 4

# Exhibit 2

13   0599

Return To:
**Chesapeake Bank**
**P. O. Box 2256**
**Kilmarnock, VIRGINIA 22482**
Attn.: **SHIPPING DEPT./DOC. CONTROL**
Prepared By:

**Chesapeake Bank**
**P. O. Box 2256**
**Kilmarnock, VIRGINIA 22482**

Tax Map Reference #: 17-(13)C

RPC/Parcel ID #:  Parcel B Revised & Parcel C Revised

_____

[Space Above This Line For Recording Data]

# DEED OF TRUST

The following information, as further defined below, is provided in accordance with Virginia law:

This Deed of Trust is given **this 22nd day of Apri l, 2013** by **Christopher David MCGINNIS a married man** as Borrower (trustor), to **Pamela D. CHAPMAN and Dianne HALL**, as Trustee, **whose address is 35 School Street, Kilmarnock, VIRGINIA 22482** for the benefit of **Chesapeake Bank**, as beneficiary.

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **April 22, 2013**, together with all Riders to this document.
**(B) "Borrower"** is Christopher David MCGINNIS. Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is Chesapeake Bank. Lender is a corporation organized and existing under the laws of **the State of VIRGINIA**. Lender's address is **P. O. Box 2256, Kilmarnock, VIRGINIA 22482**. Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is **Pamela D. CHAPMAN and Dianne HALL**. Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia. Trustee's address is 35 School Street, Kilmarnock, VIRGINIA 22482.
"Trustee" is **N/A**. Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia. Trustee's address is **N/A**.
**(E) "Note"** means the promissory note signed by Borrower and dated **April 22, 2013**. The Note states that Borrower owes Lender **Two Hundred Si x Thousand And 00/ 100** Dollars (U.S. **$206,000.00**) plus interest. Borrower has

VIRGINIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                            Form 3047 1/01
6(VA) (0811)                                             Page 1 of 13
vactd

promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 1, 2033**. The interest rate stated in the Note is **Five** percent (**5.000%**).  If this Security Instrument is an adjustable rate mortgage loan, this initial rate is subject to change in accordance with the attached Adjustable Rate Rider.

**(F)  "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider     [ ] Condominium Rider          [ ] Second Home Rider
[ ] Balloon Rider             [ ] Planned Unit Development Rider   [X] 1-4 Family Rider
[ ] VA Rider                  [ ] Biweekly Payment Rider      [ ] Other(s) [specify]

**(I)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)  "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)  "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County [Type of Recording Jurisdiction] of **MATHEWS** [Name of Recording Jurisdiction]:

**SEE EXHIBIT "A" ATTACHED HERETO AND BY THIS REFERENCE MADE A PART HEREOF.**

which currently has the address of
**1950 Lily's Neck Road**                                                    [Street]
**Moon**                          [City/County], Virginia **23119**            [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  **Payment of Principal, Interest, Escrow It ems, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.  Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.  Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10.  These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA , but in no more than 12 monthly payments.  If there is a deficiency of Funds

held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.   Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.   Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair

and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its

interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage**

**Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by

Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken,

that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give no     tice to Borrower prior to     acceleration following Borrower's breach of any covenant or agreement in this  Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Th   e notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 d    ays from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to    cure the default on or before the date specified in the notice may result in acceleration of the sums secured by th   is Security Instrument and sale of the  Property. The notice shall further inform Bo   rrower of the right to reinstate after a   cceleration and the right to bring a court action to assert the non-existence of a default or any ot   her defense of Borrower to a cceleration and sale. If the default is not cured on or before the date specified in      the notice, Lender at its option may require immediate payment in full of all sums secured by this Securi   ty Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicab    le Law. Lender shall be    entitled to collect all expenses incurred in pursuing the remedies provided in this  Section 22, including, but  not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender or Trustee  shall give to Borrower, the owner of the Property, and all other persons, noti ce of sale as required by this Applicable Law. Trust  ee shall give public notice of sale by advertising, in accordance with App licable Law, once a week for two succe  ssive weeks in a newspaper having general circulation in the county or ci ty in which any part of the Property i  s located, and by such addi tional or any different form of advertisement the Trustee deems advisa ble. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not   later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Prop erty at public auction to the highest bidder at the time and place and under the terms designated in the notice of   sale in one or more parcels and in any order Trustee**

determines.  Trustee may postpone sale of all or any    parcel of the Property by advertising in accordance with Applicable Law.  Lender or its designee may purchase the Property at any sale.

Upon sale of the Property, Trustee shall apply the  proceeds in the order prescribed by law.  Lender may purchase the Property.  The trustee shall be entitled to a    commission of 5% of sales price at foreclosure.  If the property is advertised for foreclosure but not sold, the trus tee shall be entitled to a commission of 2½%  of loan balance.

Trustee shall deliver to the purchaser Trustee's deed  conveying the Property with special warranty of title.  The recitals in the Trustee's deed shall be prima  facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sa le in the following order: (a) to di scharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, a and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of th eir priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of reco rd inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Pr operty prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

**23.  Release.**  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee.  Trustee shall release this Security Instrument.  Borrower shall pay any recordation costs.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24.  Substitute Trustee.**  Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder.  Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25.  Statutory Short Form References.**

This Deed of Trust shall be construed to impose and confer upon the parties hereto, and the beneficiaries hereunder, all duties, rights and obligations as set forth in Section 55-59,and 55-59.1, through 55-59.4,and 55-60 of the Code of Virginia as now in force and (to the extent that any amendment thereof shall not limit the rights of the Trustees or beneficiaries hereunder or the obligations of the Grantor) as hereafter amended; and further to incorporate herein the following provisions by the short form references below, of Sections 55-59, and 55-59.1 through 55-59.4.and 55-60 of the Code of Virginia:

ADVERTISEMENT REQUIRED:  Two times in a newspaper published or having general circulation in Lancaster County.

BIDDER'S DEPOSIT: of Ten Percent (10%) may be required.
EXEMPTIONS WAIVED.
SUBJECT TO CALL UPON DEFAULT.
DEFERRED PURCHASE MONEY.
RENEWAL OR EXTENSION PERMITTED before, at or after maturity.
Any Trustee may act
Substitution of Trustee permitted
Reinvestment permitted

**NOTICE:  THE DEBT SECURED HEREBY IS     SUBJECT TO CALL  IN  FULL OR THE TERMS THERE OF BEING MODIFIED  IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
Christopher David MCGINNIS                    -Borrower

STATE OF VIRGINIA, Mathews County, ss:

The foregoing instrument was acknowledged before me this 22nd day of April 2013 by **Christopher David MCGINNIS a married man**

_____
Notary Public

My Commission Expires: 2-28-2015
Notary Registration Number: 7503221

Catherine Leary Estep
Commonwealth of Virginia
Notary Public
Commission No. 7503221
My Commission Expires 2/28/2015

# ADJUSTABLE RATE RIDER

### (Wall Street Journal Prime Rate Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **22nd** day of **April, 2013**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Chesapeake Bank** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

### 1950 Lily's Neck Road, Moon, VIRGINIA 23119
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM AND MINIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

#### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of **5.000%**. The Note provides for changes in the interest rate and the monthly payments as follows:

#### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the **first** day of **May, 2016**, and on that day every 36th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Changes in the interest rate are governed by changes in an interest rate index called the "Index." The "Index" is the lowest Prime Rate charged by banks as published in the Wall Street Journal "Money Rates" table. The most recent Index figure available as of the date 35 days before each Change Date is called the "Current Index"

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Zero and 49/100** percentage points (**0.490%**) to the Current Index. The note holder will then round the result of the

---

Multistate Adjustable Rate Rider

usc1prrd

addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D)  Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **8.000%** or less than **5.000%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **Three** percentage points (**3.000%**) from the rate of interest I have been paying for the preceding 36 months. My interest rate will never be greater than **11.000%**, nor less than 5.000%.

### (E)  Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F)  Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that

Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Multistate Adjustable Rate Rider

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
Christopher David MCGINNIS              -Borrower

Multistate Adjustable Rate Rider

Page 4 of 4

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **22nd** day of **April, 2013**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **Chesapeake Bank** ( the "Lender") of the same date and covering the Property described in the and located at:

### 1950 Lily's Neck Road, Moon, VIRGINIA 23119
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.  ADDITIONAL PROPERTY SUB  JECT TO THE SECURITY INST  RUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B.  USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change.  Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C.  SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D.  RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

MULTISTATE 1-4 FAMILY RIDER – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3170 1/01
57R(0811)                                            Page 1 of 4
usc3170

E. **"BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

F. **BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

G. **ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

H. **ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs.

**MULTISTATE 1-4 FAMILY RIDER – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                    Form 3170 1/01
57R(0811)                                                Page 2 of 4

Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)
Christopher David MCGINNIS          -Borrower

MULTISTATE 1-4 FAMILY RIDER – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3170 1/01
57R(0811)                                    Page 4 of 4

# EXHIBIT "A"

ALL THAT CERTAIN LOT, PIECE OR PARCEL OF LAND LYING AND BEING IN
WESTVILLE DISTRICT, MATHEWS COUNTY, VIRGINIA, CONTAINING 4.80 ACRES,
MORE OR LESS, SHOWN AND DESCRIBED AS "REVISED PARCEL B 4.80 AC±" ON
THAT CERTAIN PLAT DATED JANUARY 20, 2003, ENTITLED "PLAT OF PROPERTY
LINE ADJUSTMENT ON THE PROPERTY OF JUDITH TAMMANY GAON PERSONAL
TRUST CREATING REVISED PARCEL B - 4.80 AC ± & REVISED PARCEL C - 67.80 AC ±"
AND RECORDED IN THE CLERK'S OFFICE OF THE CIRCUIT COURT OF MATHEWS
COUNTY, VIRGINIA IN CLERK'S PLAT BOOK 24 AT PAGE 156.

TOGETHER WITH AND SUBJECT TO A PERPETUAL NON-EXCLUSIVE EASEMENT OF
RIGHT OF WAY THIRTY FEET (30') IN WIDTH AS A MEANS OF INGRESS AND EGRESS
TO AND FROM STATE ROUTE 644, MORE PARTICULARLY DESCRIBED IN A CERTAIN
DEED OF RUTH WEBER DOWNS, ET AL., DATED JULY 15, 1989 AND RECORDED IN
THE AFORESAID CLERK'S OFFICE IN DEED BOOK 151 PAGE 345.

TOGETHER WITH AND SUBJECT TO A FORTY FOOT (40') PERPETUAL NON-
EXCLUSIVE EASEMENT OF RIGHT OF WAY SHOWN AS "LILLY'S NECK LANE" ON
THE AFORESAID PLAT, WHICH RIGHT OF WAY SERVES PARCEL A AND REVISED
PARCELS B AND C AS SHOWN ON THE AFORESAID PLAT AS A MEANS OF INGRESS
AND EGRESS TO AND FROM THE 30' RIGHT OF WAY LEADING TO STATE ROUTE 644.

TOGETHER WITH AND SUBJECT TO PERPETUAL NON-EXCLUSIVE TWENTY FOOT
(20') SEWER EASEMENT, DESIGNATED ON THE AFORESAID PLAT AND A
PERPETUAL DRAINFIELD EASEMENT, DESIGNATED ON THE AFORESAID PLAT AS
"DRAINFIELD EASE. PARCEL B", FOR THE PURPOSE OF INSTALLING,
CONSTRUCTING, MAINTAINING, INSPECTING, OPERATING, REPAIRING, ALTERING,
REPLACING AND REMOVING A SEWAGE DISPOSAL SYSTEM AND THE NECESSARY
SEWER LINES, AND OTHER APPURTENANT FACILITIES FOR THE COLLECTION AND
TRANSMISSION OF SEWAGE AND OTHER WASTES, THROUGH SAID LINES, AS WELL
AS A TEMPORARY CONSTRUCTION EASEMENT FOR THE AFORESAID PURPOSES
ACROSS THE PROPERTY OF GRANTORS.

SUBJECT TO A TWENTY FOOT (20') SEWER EASEMENT FOR "PARCEL A" AS SHOWN
ON THE AFORESAID PLAT.

BEING THE SAME REAL ESTATE CONVEYED TO CHRISTOPHER DAVID MCGINNIS
BY DEED FROM DANIEL J. CLEARY, III AND SUSANNE C. CLEARY, HUSBAND AND
WIFE, DATED APRIL 10, 2013 AND RECORDED IMMEDIATELY PRIOR TO THIS
INSTRUMENT IN THE CLERK'S OFFICE OF THE CIRCUIT COURT OF MATHEWS
COUNTY, VIRGINIA.

INSTRUMENT #130000599
RECORDED IN THE CLERK'S OFFICE OF
COUNTY OF MATHEWS ON
APRIL 22, 2013 AT 04:19PM
ANGELA C. INGRAM CLERK
RECORDED BY: ACI

# Exhibit 3

## CHANGE IN TERMS AGREEMENT

Chesapeake Bank
P. O. Box 2256
Kilmarnock, Virginia 22482 (804)435-1181

| LOAN NUMBER | ORIGINAL LOAN AMOUNT | CURRENT CREDIT BALANCE | ORIGINAL AGREEMENT DATE | AGREEMENT CHANGE DATE |
|---|---|---|---|---|
| 9290 | $206,000.00 | $193,928.86 | April 22, 2013 | July 28, 2016 |

## BORROWER INFORMATION

**Name: C David McGinnis**

**Address:**
**2924 Bells Road, Richmond, VA 23234**

**BORROWER.** The term "Borrower" means each party identified above and will be referred to as "I," "Me" or "My" throughout this Agreement.

**LENDER.** The term "Lender" means Chesapeake Bank whose address is P. O. Box 2256 Kilmarnock, Virginia 22482, its successors and assigns and will be referred to as "You" or "Your" throughout this Agreement.

**COLLATERAL.** The following items are the security documents related to this Agreement:
  • Security Instrument (Mortgage/Deed of Trust/Security Deed) in the amount of **$206,000.00**, dated April 22, 2013, evidencing a lien on the property located at **1950 Lily's Neck Road, Moon, VA 23119**

**TERMS AND PROVISIONS.** In consideration of the promises contained in this Agreement and in the instruments evidencing the Deed of Trust, and of other good and valuable consideration, the sufficiency of which is acknowledged by the execution of this Agreement, I agree to the following provisions:

1.    **The Instrument evidencing the Deed of Trust is modified and supplemented as follows:**

       1)    Effective September 1, 2016, the payment will be the monthly interest billed plus $200.

2.    **Ratification and Continued Validity.** Except for the terms expressly modified by this Agreement, by signing this Agreement I acknowledge that I am still bound by the terms of the instruments and prior modifications, extensions, and supplements evidencing the Credit Line as if they were fully set forth and repeated in this Agreement and that those terms will continue to bind me as provided in this Agreement and those instruments. Your consent to this Agreement does not waive the right to strictly enforce Your rights under this Agreement or the instruments evidencing the Credit Line. Your consent to this Agreement does not mean that You must enter into another agreement like this one in the future. You and I intend that this Agreement does not replace the Credit Line but restates it as modified.

3.    **Others Responsible for the Debt.** You and I intend that anyone else who is liable for the Credit Line, including, without limitation, cosigners, guarantors, and co-borrowers, are not relieved of any obligation except as expressly relieved in this Agreement or other writing. I agree that the liability of each person who signed the instruments evidencing the Credit Line, whether primary or secondary, continues in full force and effect, even if that person does not sign this Agreement. This promise applies not only to this Agreement but also to any extension, modification, or other agreement I make with You that represents a debt which includes cosigners, guarantors, co-borrowers, and others having similar liability. I understand that this Agreement is contingent on the continued liability of each person who signed the documents evidencing the Credit Line, whether or not that person signs this Agreement.

4.    **Pronouns and Gender.** In this Agreement, whenever the circumstances or the context so requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa.

5.    **Miscellaneous Terms.** I agree that if You delay or forgo enforcing Your rights under this Agreement in any particular instance, You retain the right to strictly enforce the same provision in any other instance, or later in the same instance. Every person signing this Agreement waives, to the extent allowed by law, presentment, demand, protest, and notice of dishonor. Every person signing this Agreement agrees that You may renew, extend, supplement, or otherwise modify the debt represented by this Agreement and the documents evidencing the Credit Line without the permission of any other person who is liable, and such modification will not release or reduce    the    liability    of    any    party,    even    if    that    party    does    not    sign    this    Agreement.

**ORAL AGREEMENTS DISCLAIMER.** This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

By signing this Change In Terms Agreement, each Borrower acknowledges reading, understanding, and agreeing to all its provisions, and receiving a copy.

_____    8/16/2016          _____
C David McGinnis                            Date

_____                   _____

By signing this Change In Terms Agreement, Lender acknowledges reading, understanding, and agreeing to all its provisions.

Chesapeake Bank

_____    8/25/16
By : TINA K. KENT                          Date
Its: Assistance Vice President

© 2004 2006 Complicate Systems, Inc. 1368 0587  2009 3 5)
Change in Terms Agreement - DL6006                                    Page 2 of 2

# Exhibit 4

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

In Re:  Christopher David McGinnis,                          Case No. 17-32815-KLP
                          Debtor.                            Chapter 7 Proceeding

| | |
|---|---|
| CHESAPEAKE BANK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CHRISTOPHER DAVID MCGINNIS, | ) |
| and | ) |
| HARRY SHAIA, JR., Trustee, | ) |
| | ) |
| Defendants. | ) |

### <u>CONSENT ORDER GRANTING RELIEF FROM STAY</u>

Upon consideration of the Motion of Chesapeake Bank to modify the automatic stay; it is

ORDERED that the automatic stay imposed by 11 U.S.C. §362 is modified to permit the

movant and its successors and assigns to enforce the lien of its deed of trust as it pertains to the

real property known as 1950 Lily's Neck Road, Moon, Virginia 23119, and as more particularly

described as follows:

> ALL THAT CERTAIN LOT, PIECE OR PARCEL OF LAND LYING AND
> BEING IN WESTVILLE DISTRICT, MATHEWS COUNTY, VIRGINIA,
> CONTAINING 4.80 ACRES, MORE OR LESS, SHOWN AND DESCRIBED
> AS "REVISED PARCEL B 4.80 AC±" ON THAT CERTAIN PLAT DATED
> JANUARY 20, 2003, ENTITLED "PLAT OF PROPERTY LINE
> ADJUSTMENT ON THE PROPER TY OF JUDITH TAMMANY GAON
> PERSONAL TRUST CREATING REVISED PARCEL B - 4.80 AC ± &
> REVISED PARCEL C - 67.80 AC ±" AND RECORDED IN THE CLERK'S
> OFFICE OF THE CIRCUIT COURT OF MATHEWS COUNTY, VIRGINIA IN
> CLERK'S PLAT BOOK 24 AT PAGE 156.

Robert H. Chappell, III, Esquire (VSB #31698)
Jennifer J. West, Esquire (VSB #47522)
James K. Donaldson, Esquire (VSB #80307)
Spotts Fain PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Phone:  (804) 697-2000  Fax:  (804) 697-2100
*Counsel for Chesapeake Bank*

TOGETHER WITH AND SUBJECT TO A PERPETUAL NON-EXCLUSIVE EASEMENT OF RIGHT OF WAY THIRTY FEET (30') IN WIDTH AS A MEANS OF INGRESS AND EGRESS TO AND FROM STATE ROUTE 644, MORE PARTICULARLY DESCRIBED IN A CERTAIN DEED OF RUTH WEBER DOWNS, ET AL., DATED JULY 15, 1989 AND RECORDED IN THE AFORESAID CLERK'S OFFICE IN DEED BOOK 151 PAGE 345.

TOGETHER WITH AND SUBJECT TO A FORTY FOOT (40') PERPETUAL NON- EXCLUSIVE EASEMENT OF RIGHT OF WAY SHOWN AS "LILLY'S NECK LANE" ON THE AFORESAID PLAT, WHICH RIGHT OF WAY SERVES PARCEL A AND REVISED PARCELS B AND C AS SHOWN ON THE AFORESAID PLAT AS A MEANS OF INGRESS
AND EGRESS TO AND FROM THE 30' RIGHT OF WAY LEADING TO STATE ROUTE 644.

TOGETHER WITH AND SUBJECT TO PERPETUAL NON-EXCLUSIVE TWENTY FOOT (20') SEWER EASEMENT, DESIGNATED ON THE AFORESAID PLAT AND A PERPETUAL DRAIN FIELD EASEMENT, DESIGNATED ON THE AFORESAID PLAT AS "DRAINFIELD EASE. PARCEL B", FOR THE PURPOSE OF INSTALLING, CONSTRUCTING, MAINTAINING, INSPECTING, OPERATING, REPAIRING, ALTERING, REPLACING AND REMOVING A SEWAGE DISPOSAL SYSTEM AND THE NECESSARY SEWER LINES, AND OTHER APPURTENANT FACILITIES FOR THE COLLECTION AND TRANSMISSION OF SEWAGE AND OTHER WASTES, THROUGH SAID LINES, AS WELL AS A TEMPORARY CONSTRUCTION EASEMENT FOR THE AFORESAID PURPOSES ACROSS THE PROPERTY OF GRANTORS.

SUBJECT TO A TWENTY FOOT (20') SEWER EASEMENT FOR "PARCEL A" AS SHOWN ON THE AFORESAID PLAT.

BEING THE SAME REAL ESTATE CONVEYED TO CHRISTOPHER DAVID MCGINNIS BY DEED FROM DANIEL J. CLEARY, III AND SUSANNE C. CLEARY, HUSBAND AND WIFE, DATED APR IL 10, 201 3 AND RECORDED IMMEDIATELY PRIOR TO THIS INSTRUMENT IN THE CLERK'S OFFICE OF THE CIRCUIT COURT OF MATHEWS COUNTY, VIRGINIA.

which relief shall extend to the purchaser at the foreclosure sale to allow the purchaser to take

such action under state law, as may be necessary, to obtain possession of the property.

DATED:

_____
United States Bankruptcy Judge

ENTERED ON DOCKET:

ENDORSEMENTS OF:

/s/ Robert H. Chappell, III
Robert H. Chappell, III, Esquire (VSB #31698)
Jennifer J. West, Esquire (VSB #47522)
James K. Donaldson, Esquire (VSB #80307)
Spotts Fain PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Phone:  (804) 697-2000
Fax:  (804) 697-2100
*Counsel for Chesapeake Bank*

/s/ Hunter R. Wells (by Robert H. Chappell, III with permission via email)
Hunter R. Wells
Canfield, Wells & Kruck, LLP
4124 E. Parham Road
Henrico, Virginia 23228
*Debtor's Counsel*

/s/ William A. Broscious (by Robert H. Chappell, III with permission via email)
William A. Broscious
Kepley Broscious & Biggs, PLC
2211 Pump Road
Richmond, VA 23233
*Chapter 7 Trustee's Counsel*

## <u>CERTIFICATION</u>

The undersigned hereby certifies that the foregoing Consent Order Granting Relief from Stay is identical to the form order required by Administrative Order 10-2 and that no modifications, additions or deletions have been made.  The undersigned hereby certifies that the foregoing Consent Order Granting Relief from Stay has been endorsed by or served on all necessary parties as required by Local Rule 9022-1(C).

12/18/2017 _____                    /s/   Robert H. Chappell, III _____
                                        Counsel for Movant

**PARTIES TO RECEIVE COPIES:**

Christopher David McGinnis
P.O. Box 191
Petersburg, VA 23804

Hunter R. Wells
Canfield, Wells & Kruck, LLP
4124 E. Parham Road
Henrico, VA 23228

Harry Shaia, Jr
Spinella, Owings & Shaia, P.C.
8550 Mayland Drive

William A. Broscious
Kepley Broscious & Biggs, PLC
2211 Pump Road
Richmond, VA 23233

Judy A. Robbins
Office of the U.S. Trustee - Region 4-R
701 E. Broad Street, Suite 4304
Richmond, VA 23219

Shannon Pecoraro
Office of the U.S. Trustee
701 East Broad Street, Suite 4304
Richmond, VA 23219

Robert H. Chappell, III
Spotts Fain PC
411 East Franklin Street, Suite 600
Richmond, VA 23219